IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BOBBY THOMAS, et al.                       :

                                           :

     v.                      : Civil Action No. DKC 2005-2555

                                           :

COUNTRYWIDE HOME LOANS, INC.
                                           :

## MEMORANDUM OPINION

Presently pending and ready for resolution in this case are:
(1) a motion by Defendant Countrywide Home Loans, Inc.
("Countrywide") to dismiss for failure to state a claim and for
failure to join a necessary party, or, in the alternative, for
summary judgment (paper 16); (2) a motion by Plaintiffs Bobby and
Mary Thomas to amend the First Amended Complaint (paper 25); and
(3) a motion by Countrywide to file a surreply (paper 29).  The
issues have been fully briefed and the court now rules, no hearing
being deemed necessary.  Local Rule 105.6.  For the reasons that
follow, Countrywide's motion to dismiss the complaint for failure
to state a claim will be granted, and Plaintiffs' motion for leave
to amend and Countrywide's motion for leave to file a surreply will
be denied.

## I.   Background

## A.   Factual Background

Plaintiffs allege the following facts in their complaint.
Plaintiffs financed the purchase of their Hyattsville home through

Market Street Mortgage Company in 1991. Plaintiffs' loan subsequently was assigned to several different mortgage servicers, including Countrywide, which acquired the loan on August 1, 2002. After this acquisition, Plaintiffs "continued to make their mortgage payments to defendant Countrywide Mortgage Company" through the period in question "without incidence [*sic*]."[1] (Paper 12, ¶¶ 12-13).

At some point, Plaintiffs sought to refinance their home loan through Ameriquest Mortgage Company ("Ameriquest"). Plaintiffs allege that, on or about February 1, 2005, Ameriquest received a pay-off statement from Countrywide indicating that the pay-off amount for their loan was $144,201.01. On or about February 23, 2005, Plaintiffs and Ameriquest closed on the refinancing loan, and on that same day, Ameriquest "remitted to defendant a pay-off check in the amount of $148,633.15 representing full payment of loan no. 20902018." (Paper 12, ¶ 18). Also on February 23, Plaintiffs executed a "Request for Reconveyance and Estoppel," in order to obtain Countrywide's assistance in removing its lien and to reconvey its Deed of Trust. On May 27, 2005, Ameriquest "filed its Deed of Trust and paid all requisite recordation fees." (Paper 12, ¶ 20).

---

[1] Plaintiffs do not distinguish between Countrywide Home Loans, Inc., and Countrywide Mortgage Company in the complaint. Plaintiffs apparently contend that they are the same entity.

As further alleged in the complaint, on July 13, 2005, Countrywide informed Plaintiffs that they were in arrears on the loan.  Plaintiffs explained to Countrywide that they had refinanced the loan through Ameriquest.  On July 14, 2005, Countrywide's substitute trustee, Shapiro & Burson, notified Plaintiffs that they were in arrears and that Countrywide had instructed Shapiro & Burson to institute foreclosure proceedings.  On August 3, 2005, Plaintiffs personally visited Shapiro & Burson's offices and provided them with documentation of the loan refinancing. Plaintiffs allege that, notwithstanding the refinancing documentation, Shapiro & Burson informed them that the foreclosure sale was to occur on August 15, 2005.  Plaintiffs explain that "the foreclosure sale of the property has not taken place" and that "[n]o arreages [sic] exist and all fees have been paid in full." (Paper 12, ¶¶ 28, 30).

The complaint is silent with respect to Countrywide's activity or communication with Plaintiffs between the attempted refinancing in February and the notification that they were in arrears on the loan in July.  Other materials submitted to the court reveal what occurred during this period.[2]  Countrywide did not apply the payoff because the payoff check amount was an overage, more than $4,400, beyond what Plaintiffs' owed.  (Paper 16, First Hiskett decl. ¶

---

[2] Countrywide attached the declaration of Lynne Hiskett, Countrywide's First Vice-President of Payoffs and Demands, to its motion to dismiss.  (Paper 16, First Hiskett decl. ¶ 2).

13).  Plaintiffs, however, have submitted a copy of Countrywide's Payoff Demand Statement, which reads in part: "If Countrywide receives funds greater than the amount required to pay off your loan, we will automatically process the overage within 14 days after payoff and return the excess amount to you." (Paper 20, ex. A, at 2).  In response, Countrywide submitted additional materials explaining that when payoffs include overages of $1,000 or more, Countrywide does additional research and contacts the title company before posting the payoff.  When overages are greater than $2,000, Countrywide requires one of its team leaders or assistant team leaders to take "other actions" before approving the payoff. (Paper 22, Second Hiskett decl. ¶ 6).

Countrywide explains that it "followed these procedures and tried to contact Plaintiffs and their title company, Customer Title, but received no response." (Paper 22, Second Hiskett decl. ¶ 7).  "On or about March 8, 2005, having received no response from either Plaintiffs or Custom Title, Countrywide returned the funds to Custom Title."[3]  (Paper 16, First Hiskett decl. ¶ 15). Countrywide states that Plaintiffs stopped making loan payments in or around March 2005, and that it notified Plaintiffs that they were in default on the loan on April 18, 2005.  (Paper 16, First

---

[3] The materials submitted by Countrywide indicate that Custom Title remitted the payoff check, (paper 16, First Hiskett decl. ¶ 13), whereas Plaintiffs' materials, which include the payoff letter, indicate that Ameriquest Mortgage Company remitted the payoff, (paper 20, ex. B).

Hiskett decl. ¶¶ 16-17).  In addition, Countrywide states that it notified Plaintiffs on May 4, 2005, that it had not applied the payoff check to the account.[4]

## B.    Procedural Background

On August 15, 2005, Plaintiffs filed their original complaint against Countrywide in the Circuit Court for Prince George's County, Maryland, seeking a temporary restraining order, preliminary and permanent injunctive relief, and damages. (Paper 2).  On September 14, 2005, Countrywide filed a notice of removal from the circuit court to this court on the basis of federal question and diversity jurisdiction.  (Paper 1).  On that date, Plaintiffs filed their First Amended Complaint in the circuit court.  (Paper 12).[5]

Plaintiffs' First Amended Complaint contains the following claims: (1) violations of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*, (counts I-II); (2) violations of 42 U.S.C. § 1981 (count III); (3) violations of 42 U.S.C. § 1982 (count IV); (4) violations of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604-3605 (count V); (5) violations of the Maryland Equal Credit Opportunity Act ("MECOA"), Md. Code Ann., Com. Law §§ 12-

---

[4] Plaintiff Bobby Thomas has since submitted a declaration stating that Countrywide's only communication with him was "in regard to the collection of the monthly mortgage payment." (Paper 23, Thomas decl. ¶ 12).

[5] Unless otherwise indicated, the "complaint" refers to Plaintiffs' First Amended Complaint.

701-708 (count VI); (6) violations of the Fair Debt Collection
Practices Act ("FDCPA"), 15 U.S.C. § 1692 (count VII); (7)
violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §
1681 *et seq.* (count VIII); (8) violations of the Real Estate
Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605 (count IX);
(9) violations of the Maryland Consumer Debt Collection Act
("MCDCA"), Md. Code Ann., Com. Law § 14-202 (count X); (10)
violations of the Racketeer Influenced and Corrupt Organizations
Act ("RICO"), 18 U.S.C. § 1692 (count XI); (11) a state law claim
of wrongful foreclosure (count XII);[6] and (12) violations of the
Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law
§ 13-301 (count XIII).  In addition, Plaintiffs' complaint contains
class action allegations (count XIV) and two counts setting forth
the relief sought (counts XIII-XIV), which includes injunctive
relief, attorneys' fees, and both statutory and actual damages.

On October 27, 2005, Countrywide moved to dismiss the
complaint for failure to state a claim pursuant to Fed.R.Civ.P.
12(b)(6), failure to join a necessary party pursuant to
Fed.R.Civ.P. 12(b)(7), and, in the alternative, for summary
judgment pursuant to Fed.R.Civ.P. 56.  (Paper 16).  Plaintiffs
opposed Countrywide's motion in a memorandum filed on December 15,
2005.  (Paper 19).  On January 8, 2006, Plaintiffs filed a motion

---

[6] Although not labeled as such in the complaint, both parties
construe this count as asserting the Maryland tort of malicious use
of civil process.

requesting leave to amend the First Amended Complaint.  (Paper 25).

In their proposed Second Amended Complaint, Plaintiffs seek to add

Donald  and  Marisol  Thompson  as  plaintiffs,  to  add  counts

specifically relating to the Thompsons, and to dismiss the RICO

count of the First Amended Complaint (count XI) without prejudice.[7]

Following the filing of Countrywide's opposition to amendment and

Plaintiffs' reply, Countrywide filed a motion seeking leave to file

a surreply.  (Paper 29).

## II.  Motion to Dismiss

### A.    Standard of Review

The  purpose  of  a  motion  to  dismiss  pursuant  to  Fed.R.Civ.P.

12(b)(6) is to test the sufficiency of the plaintiff's complaint.

*See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

Accordingly,  a  12(b)(6)  motion  ought  not  be  granted  unless  "it

appears beyond doubt that the plaintiff can prove no set of facts

in support of his claim which would entitle him to relief."  *Conley*

*v. Gibson*, 355 U.S. 41, 45-46 (1957).  Except in certain specified

cases, a plaintiff's complaint need only satisfy the "simplified

pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534

U.S. 506, 513 (2002), which requires a "short and plain statement

---

[7] In their Second Amended Complaint, Plaintiffs also seek to
dismiss "defendant Shapiro & Burson, LLP without prejudice."
(Paper 25).   The court need not address this request because
Shapiro & Burson never was named as a defendant in this action.

of the claim showing that the pleader is entitled to relief."[8]
Fed.R.Civ.P. 8(a)(2).

In its determination, the court must consider all well-pled allegations in a complaint as true, *see Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). The court must disregard the contrary allegations of the opposing party. *See A.S. Abell Co. v. Chell*, 412 F.2d 712, 715 (4th Cir. 1969). The court need not, however, accept unsupported legal allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

---

[8] The United States Court of Appeals for the Fourth Circuit "has not, however, interpreted *Swierkiewicz* as removing the burden of a plaintiff to allege facts sufficient to state all the elements of her claim." *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (holding dismissal proper where plaintiff did not allege facts in support of all of the required elements of a discrimination claim), *cert. denied*, 540 U.S. 940 (2003). Only the presence of alleged facts, and not simply legal conclusions, will allow a plaintiff to present a proper claim for relief. *Id.*

**B.    Analysis**

**1.    Disparate Impact Discrimination Claims (ECOA and MECOA)**

Plaintiffs base two of their claims, the alleged violations of the ECOA (counts I-II) and the MECOA (count VI), on a disparate impact theory of racial discrimination.   Plaintiffs assert that Countrywide's facially neutral "mortgage servicing policy which ultimately triggers default and the institution of foreclosure proceedings" has a disparate impact on African-Americans.  (Paper 12, ¶ 50(a)).  Plaintiffs argue that the:

> disparity between the frequency and number of defaults
> and foreclosure filings on African-Americans in Prince
> Georges [*sic*] County and Baltimore City and that charged
> to similarly situated White Americans in Montgomery,
> Howard, Charles, Frederick, Anne Arundel and Cecil
> counties indicates a clear causal connection between the
> mortgage servicing policy and the discriminatory
> result[.]

(Paper 12, ¶ 50(b)).  In factual support of this contention, Plaintiffs allege that the number of all foreclosures in Prince George's County and Baltimore City is higher than the number of all foreclosures in the second group of counties, and that Prince George's County and Baltimore City are majority African-American jurisdictions, whereas the other counties are not.  Countrywide argues that neither the ECOA or the MECOA applies because the statutes have "nothing to do with collection practices," and instead are limited to regulating extensions of credit.  (Paper 16, at 8).  In addition, Defendant asserts that the disparate impact

claims do not allege discrimination and are otherwise "nonsensical."

The ECOA makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age."[9]  15 U.S.C. § 1691(a).  An "applicant" is defined in the statute as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit."  15 U.S.C. § 1691a(b).

Section 1691b of the ECOA authorizes the Board of Governors of the Federal Reserve System ("Board") to prescribe regulations to carry out the purpose of the Act.  15 U.S.C. § 1691b.  The Board has defined "applicant" broadly as "any person who requests or who has received an extension of credit from a creditor, and includes any person who is or may become contractually liable regarding an extension of credit."  12 C.F.R. § 202.2(e).  The Board has defined

---

[9]  The ECOA also mandates that an applicant against whom "adverse action" is taken be provided with the creditor's reasons for taking such action.  15 U.S.C. § 1691(d)(2).  This portion of the statute is not applicable because "adverse action" is defined as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit."  15 U.S.C. § 1691(d)(6).  Adverse action does not include "any action or forbearance relating to an account taken in connection with inactivity, default, or delinquency as to that account."  12 C.F.R. § 202.2(c)(2)(ii).

"credit transaction" as encompassing "every aspect of an applicant's dealings with a creditor regarding an application for credit or an existing extension of credit (including, but not limited to, . . . revocation, alteration, or termination of credit; and collection procedures)." 12 C.F.R. § 202.2(m). It is correct that "the animating principle of the ECOA and its state analogues is to prevent discrimination against those *applying for credit*." *Capitol Indem. Corp. v. Aulakh*, 313 F.3d 200, 202 (4th Cir. 2002) (emphasis added). Nevertheless, the act applies more broadly than to those applicants who are rejected, and can cover collection procedures as well. *Hargraves v. Capital City Mortgage Corp.*, 140 F.Supp.2d 7, 23 (D.D.C. 2000).

The MECOA is Maryland's version of the ECOA. The Maryland statute states that creditors "may not discriminate against any applicant on the basis of sex, marital status, race, color, religion, national origin, or age" with respect to any aspect of a credit transaction. Md. Code Ann., Com. Law § 12-704(1). An "applicant" is defined in the Maryland law as "any person who applies to a creditor: (1) Directly for an extension, renewal, or continuation of credit; or (2) Indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." Md. Code Ann., Com. Law § 12-701(b). The prohibitions found in the MECOA are linked entirely to the federal statute: compliance with the ECOA satisfies the MECOA, whereas ECOA

violations constitute violations of the MECOA.  Md. Code Ann., Com. Law §§ 12-704(2) - 704(3).

Countrywide's argument that these two statutes are not applicable to the facts of this case because it did not "extend" credit, but rather sought to collect, is misplaced.  The regulations promulgated by the Board in implementing the ECOA provide an expansive reading of the statute that extends beyond Countrywide's narrow interpretation of the provisions. Accordingly, Countrywide's argument concerning the reach of these statutes appears to be without merit.  Nevertheless, Plaintiffs' ECOA and MECOA claims, as stated, still fail because Plaintiffs do not state a prima facie case of discrimination.

Discrimination in violation of the ECOA and the MECOA can be alleged in three different ways: (1) direct evidence of discrimination; (2) the disparate treatment approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973); and (3) a disparate impact analysis.[10]  *Faulkner v. Glickman*, 172 F.Supp.2d 732, 737 (D.Md. 2001) (citing *A.B. & S. Auto Serv., Inc. v. S. Shore Bank of Chi.*, 962 F.Supp. 1056, 1060 (N.D.Ill. 1997)). Plaintiffs seek to establish that Countrywide discriminated against

---

[10] A footnote to the Board regulations implementing the ECOA explains that the "legislative history of the Act indicates that the Congress intended an 'effects test' concept, as outlined in the employment field by the Supreme Court . . . to be applicable to a creditor's determination of creditworthiness."  12 C.F.R. § 202.6(a) n.2.

them based on allegations of a disparate impact on minority borrowers.[11]

To establish a disparate impact claim under the ECOA (or the MECOA), Plaintiffs "must show how a policy, procedure, or practice specifically identified by the [plaintiffs] has a significantly greater discriminatory impact on members of a protected class." *A.B. & S.*, 962 F.Supp. at 1060 (internal quotation marks and brackets omitted). Thus, the operative question is "whether the policy in question had a disproportionate impact on the minorities in the total group to which the policy was applied." *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 987 (4th Cir. 1984). In other words, Plaintiffs must allege the following two elements in support of a disparate impact claim under the ECOA or the MECOA: (1) a specifically-identifiable policy, procedure, or practice and (2) that the specific policy "caused a significant disparate impact" on minorities. *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1242 (10th Cir. 1991); *A.B. & S.,* 962 F.Supp. at 1060.

Plaintiffs' disparate impact claim is insufficient in two respects. First, Plaintiffs have not identified with sufficient particularity a specific foreclosure policy, practice, or procedure

---

[11] Even assuming Plaintiffs were alleging a disparate treatment claim pursuant to the ECOA and MECOA, the claims still fail because there is no allegation that Countrywide "did not seek to foreclose on the property of white mortgagors who were similarly situated to [Plaintiffs]." *Shipley v. First Fed. Sav. & Loan Ass'n of Del.*, 703 F.Supp. 1122, 1137 (D.Del. 1988).

on the part of Countrywide.   The portion of the complaint labeled "Class Action Allegations," in which Plaintiffs argue for certification of a class consisting of Countrywide customers who "were and are subject to defendant's mortgage servicing policy," (paper 25, ¶ 125(c)), contains some information about their theory. Plaintiffs describe the Countrywide "policy" as consisting of ten different mortgage servicing practices allegedly used by Countrywide.   (Paper 25, ¶ 124).   However, only one of these practices – "(10) refusing to accept mortgage payoffs" – corresponds with the facts alleged with respect to Plaintiffs. Yet, there is no allegation in the disparate impact section of the complaint that the adverse impact on minorities results from Countrywide's refusal to accept mortgage payoffs.   Instead, Plaintiffs reference foreclosures in general and the "unfair and deceptive collection tactics implemented by the defendant." (Paper 12, ¶ 39).   Nor does Plaintiffs' opposition memorandum offer further clarity: "Plaintiffs challenge the implementation of aggressive foreclosure practices by the defendant.   It is common knowledge that individuals in the African-American community receive more expensive loans and unfair credit terms."[12]   (Paper 20, at 14) (footnote omitted).

---

[12] There does not appear to be any factual allegation that Plaintiffs received a more expensive loan or unfair credit terms.

Second, Plaintiffs have not alleged properly that any Countrywide policy causes a disparate impact on minorities. The disparate impact portion of the complaint states that Prince George's County and Baltimore City are majority African-American jurisdictions (64.3 and 65.2 percent of the population, respectively) and that foreclosures are generally higher in those two jurisdictions. Yet, Plaintiffs do not allege, as they must, that foreclosures for African-Americans are higher than for Caucasians. Moreover, none of Plaintiffs' statistical allegations are limited to Countrywide customers. Thus, there are no facts alleged that show a link between any alleged disparate impact and any Countrywide policy. The Fourth Circuit's opinion in *Edwards v. Johnston County Health Department* is apposite here:

> [N]owhere in the Complaint do [the plaintiffs] contend that the [defendants'] actions affected non-white migrant farmworkers to a greater *degree* than white farmworkers . . . . It is true, of course, that a majority of migrant farm-workers are non-white. And given this, any policy or action taken with respect to these workers will necessarily affect more non-white than white migrant farmworkers. But merely demonstrating a statistical imbalance, without more, does not establish a greater discriminatory adverse effect on one race compared to another.

885 F.2d at 1223 (4th Cir. 1989) (affirming dismissal of a discrimination claim where disparate impact not properly alleged).

Accordingly, Plaintiffs have failed to state a claim premised on Countrywide's foreclosure policies having an adverse disparate

impact on minorities, and the ECOA claim in counts I-II and the MECOA claim in count VI will be dismissed.[13]

## 2. Intentional Discrimination Claims (42 U.S.C. §§ 1981-1982 and FHA)

Plaintiffs' remaining discrimination claims, which allege violations of section 1981 (count III), section 1982 (count IV), and the FHA (count V), are premised on a theory of intentional discrimination on the basis of race or color.  Plaintiffs assert that Countrywide's actions in foreclosing against them because of their race "were and are intentional and willful, and/or have been implemented with callous and reckless disregard for the federally protected rights of the plaintiff [*sic*]."  (Paper 12, ¶ 41).  In addition to arguing that they had a contractual right to foreclose, Countrywide argues that the "Amended Complaint is completely devoid of any factual allegation that would establish that Defendant intentionally discriminated against Plaintiffs."  (Paper 16, at 10).

Because each of these claims (§ 1981, § 1982, and the FHA claim) is premised on a theory of intentional discrimination on the part of Countrywide, the three counts can be considered together.  Plaintiffs allege that Countrywide has denied them the right to

---

[13]  Plaintiffs place too much reliance on *Hargraves*, 140 F.Supp.2d at 21 (D.D.C. 2000).  Those plaintiffs alleged facts to show that defendant did business primarily with African-American customers and that it targeted its activities at majority African-American jurisdictions.

make and enforce a contract in violation of 42 U.S.C. § 1981.
Section 1981 states, in pertinent part: "All persons within the
jurisdiction of the United States shall have the same right in
every State and Territory to make and enforce contracts."[14]   42
U.S.C. § 1981(a).   To state a § 1981 cause of action, Plaintiffs
must show: (1) they were members of a racial minority; (2) the
defendant intended to discriminate on the basis of race; and (3)
the discrimination concerned one or more of the activities
protected by the statute.   *Balt.-Clark v. Kinko's Inc.*, 270
F.Supp.2d 695, 699 (D.Md. 2003).   A § 1981 claim is limited to
allegations of *intentional* discrimination, not merely that the
defendant adopted a policy or practice that had a disparate impact
upon minorities.   *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458
U.S. 375, 391 (1982).

Plaintiffs allege that Countrywide has denied them the right
to hold and purchase real property in violation § 1982.   Section
1982 states, in its entirety: "All citizens of the United States
shall have the same right, in every State and Territory, as is
enjoyed by white citizens thereof to inherit, purchase, lease,
sell, hold, and convey real and personal property."   42 U.S.C. §
1982.   "Section 1982 generally is aimed at remedying discrimination

---

[14] Section 1981(b) defines "make and enforce contracts" as
encompassing "the making, performance, modification, and
termination of contracts, and the enjoyment of all benefits,
privileges, terms, and conditions of the contractual relationship."
42 U.S.C. § 1981(b).

relating to property, while Section 1981 provides against the refusal to contract on the basis of race." *Yates v. Hagerstown Lodge No. 212 Loyal Order of Moose*, 878 F.Supp. 788, 801 (D.Md. 1995).

With regard to the FHA, Plaintiffs assert that Countrywide violated the statute in two ways.[15] First, Plaintiffs allege that Countrywide made housing unavailable to them and discriminated against them in the provision of services in connection with the sale of dwellings because of race and/or color, in violation of 42 U.S.C. § 3604(a) and § 3604(b).[16] Second, Plaintiffs allege that

---

[15] Although Plaintiffs allege violations of both the ECOA and the FHA, they would only be permitted to recover under one statute. 15 U.S.C. § 1691e(i) ("No person aggrieved by a violation of [15 U.S.C. § 1691] and by a violation of section 3605 of Title 42 shall recover under this subchapter and section 3612 of Title 42, if such violation is based on the same transaction."); *Cooley v. Sterling Bank*, 280 F.Supp.2d 1331, 1337 n.4 (M.D.Ala. 2003). The reference to 42 U.S.C. § 3612 reflects the former numbering of the FHA's civil enforcement section, which has since been relocated to § 3613. *See* Pub.L.No. 90-284, § 812, 82 Stat. 88 (1968) (adding the private enforcement provision to the FHA, which was codified at 42 U.S.C. § 3612).

[16] Section 3604 states, in pertinent part:

[I]t shall be unlawful-

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental
(continued...)

Countrywide discriminated against them because of race and/or color in the context of a real estate-related transaction in violation of § 3605.[17]

The FHA, also known as Title VIII of the Civil Rights Act of 1968, prohibits public and private parties from engaging in certain discriminatory activities as part of ensuring "fair housing throughout the United States."[18]   42 U.S.C. § 3601.   The FHA

---

[16](...continued)
> of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. §§ 3604(a)-(b).

[17] Section 3605 states, in pertinent part:

> It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

42 U.S.C. § 3605(a).   Subsection (b) defines "residential real estate-related transactions" as including "[t]he making or purchasing of loans or providing other financial assistance."   42 U.S.C. § 3605(b).

[18] Unlike § 1981 and § 1982, both disparate treatment and disparate impact claims are recognized under the FHA.  *Edwards*, 885 F.2d at 1221.   In their opposition memorandum, however, Plaintiffs base the FHA count of their complaint entirely on a theory of intentional discrimination, (Paper 20, at 22-24), and, as noted *supra*, Plaintiffs have failed to allege a discriminatory disparate impact.

provides that an aggrieved person may commence a civil action in order to obtain appropriate relief.  42 U.S.C. § 3613(a)(1)(A).

All three counts fail because Plaintiffs do not allege facts showing that Countrywide intentionally discriminated against them on the basis of race.  Plaintiffs have not alleged that Countrywide or any of its agents were ever aware of Plaintiffs' race or color. Nor did Plaintiffs initially obtain their financing from Countrywide, nor are there any allegations in the complaint that Plaintiffs ever dealt personally with Countrywide.

Furthermore, there is no allegation in the complaint that Countrywide conducted business with Plaintiffs in a different manner than it did with respect to any other group of customers, including Caucasian customers.  Plaintiffs concede in their disparate impact claims that Countrywide's foreclosure policy is "facially neutral," and there is no allegation that Countrywide applied any policy differently when dealing with Caucasian versus African-American customers.  (Paper 12, ¶ 49).  Plaintiffs assert only the conclusory statement that Countrywide's actions were "intentional and willful."  Accordingly, Plaintiffs have failed to allege facts in support of any claim premised on intentional discrimination on the part of Countrywide.  *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2nd Cir. 1994) (stating that to avoid dismissal a "plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances

giving rise to a plausible inference of racially discriminatory intent . . . . Therefore, a complaint consisting of nothing more than naked assertions, and setting forth no facts upon which a court could find a violation of the Civil Rights Acts, fails to state a claim under Rule 12(b)(6).") (internal quotation marks omitted). Countrywide's motion to dismiss the § 1981, § 1982, and the FHA claims (counts III, IV, and V) therefore will be granted.

## 3.   Fair Debt Collection Practices Act

Plaintiffs allege in count VII that Countrywide violated the FDCPA by: (1) falsely representing the character or status of the debt; (2) threatening to take action that cannot legally be taken or that was not intended to be taken; (3) using false representations or deceptive means to collect or attempt to a debt; (4) attempting to collect amounts not permitted by law; and (5) "knowingly providing inaccurate credit reporting information." (Paper 12, ¶ 61). Countrywide asserts that the FDCPA claim should be dismissed because it is not a debt collector and thus is not governed by the statute. (Paper 16, at 13).

The "FDCPA safeguards consumers from abusive and deceptive debt collection practices by debt collectors." *Akalwadi v. Risk Mgmt. Alternatives, Inc.*, 336 F.Supp.2d 492, 500 (D.Md. 2004). The FDCPA violations alleged by Plaintiffs relate to the prohibitions found in § 1692e and § 1692f. The prohibitions contained in those

sections, however, are applicable only to debt collectors, which

are defined in the statute as:

> any person who uses any instrumentality of interstate
> commerce or the mails in any business the principal
> purpose of which is the collection of any debts, or who
> regularly collects or attempts to collect, directly or
> indirectly, debts owed or due or asserted to be owed or
> due another.  Notwithstanding the exclusion provided by
> clause (F) of the last sentence of this paragraph, the
> term includes any creditor who, in the process of
> collecting his own debts, uses any name other than this
> own which would indicate that a third person is
> collecting or attempting to collect such debts.  For the
> purpose of section 1692f(6) of this title, such term also
> includes any person who uses any instrumentality of
> interstate commerce or the mails in any business the
> principal purpose of which is the enforcement of security
> interests. The term does not include–
>
> > (A) any officer of employee of a creditor while, in
> > the name of the creditor, collecting debts for such
> > creditor;
> > . . .
> > (F) any person collecting or attempting to collect
> > any debt owed or due or asserted to be owed or due
> > another to the extent such activity (i) is
> > incidental to a bona fide fiduciary obligation or a
> > bona fide escrow arrangement; (ii) concerns a debt
> > which was originated by such person; (iii) concerns
> > a debt which was not in default at the time it was
> > obtained by such person; or (iv) concerns a debt
> > obtained by such person as a secured party in a
> > commercial credit transaction involving the
> > creditor.

15 U.S.C. § 1692a(6).  The term "creditor," on the other hand, is

defined within the FDCPA as:

> any person who offers or extends credit creating a debt
> or to whom a debt is owed, but such term does not include
> any person to the extent that he receives an assignment
> or transfer of a debt in default solely for the purpose
> of facilitating collection of such debt for another.

15 U.S.C. § 1692a(4).

The "FDCPA's provisions generally apply only to 'debt collectors.'   Creditors – as opposed to 'debt collectors' – generally are not subject to the FDCPA."[19]   *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 403 (3rd Cir. 2000) (internal citation omitted); *Scott v. Wells Fargo Home Mortgage Inc.*, 326 F.Supp.2d 709, 717-18 (E.D.Va. 2003) ("[T]he law is well-settled . . . that creditors, *mortgagors*, and *mortgage servicing companies* are not debt collectors and are statutorily exempt from liability under the FDCPA.").   With respect to assignees of debts, "an assignee of an obligation is not a 'debt collector' if the obligation is not in default at the time of the assignment; conversely, an assignee may be deemed a 'debt collector' if the obligation is already in default when it is assigned."   *Pollice*, 225 F.3d at 403.

Plaintiffs do not allege in the complaint that Countrywide is a "debt collector" as defined in the FDCPA.   Nor do the alleged facts support such an assertion.   Likewise, there is no allegation that Plaintiffs' loan already was in default when Countrywide acquired the obligation.   The complaint, which is based on Countrywide's conduct in extending and servicing consumer credit,

---

[19] The United States Court of Appeals for the Seventh Circuit has explained:  "Because creditors are generally presumed to restrain their abusive collection practices out of a desire to protect their corporate goodwill, their debt collection activities are not subject to the Act unless they collect under a name other than their own."  *Aubert v. Am. Gen. Fin., Inc.*, 137 F.3d 976, 978 (7th Cir. 1998).

demonstrates that Countrywide is in fact a "creditor" under the FDCPA and thus is not subject to the FDCPA's prohibitions. Countrywide's motion to dismiss count VII will be granted.

**4.   Fair Credit Reporting Act**

In count VIII of the complaint, Plaintiffs allege that Countrywide violated 15 U.S.C. § 1681s-2(a) of the FCRA by furnishing information to consumer reporting agencies "that remained incomplete and inaccurate." (Paper 12, ¶ 65). In addition, Plaintiffs point to "numerous instances in which plaintiffs have informed defendants [*sic*] that they dispute information furnished by defendants [*sic*] to a consumer reporting agency, defendant have [*sic*] not reported the disputes to any or all of the consumer reporting agencies to which they furnish or have furnished the information." (Paper 12, ¶ 66). Countrywide argues that § 1681s-2(a) does not provide a private cause of action. (Paper 16, at 14).

Section 1681s-2(a) governs the responsibilities of entities that furnish information to consumer reporting agencies. Subsection (a) provides, among other things, that information furnishers shall, after receiving notice of an information dispute from a consumer, provide consumers with the results of the furnisher's investigation of the dispute. 15 U.S.C. § 1681s-2(a)(8)(E). Section 1681s-2(d) of the FCRA states, however, that the protections outlined in § 1681s-2(a) "shall be enforced

exclusively as provided under section 1681s of this title *by the Federal agencies and officials and the State officials* identified in section 1681s of this title."  15 U.S.C. § 1681s-2(d) (emphasis added).  Thus, there is no private right of action for violations of § 1681s-2(a).  *Stafford v. Cross Country Bank*, 262 F.Supp.2d 776, 782-83 (W.D.Ky. 2003) (collecting cases).

Even assuming that Plaintiffs intended to cite § 1681s-2(b) in support of their FCRA claim, the complaint still is deficient. There is "abundant authority in support of the recognition of a private right of action under § 1681s-2(b)."  *Akalwadi*, 336 F.Supp.2d at 509-510 (collecting cases).  Yet, § 1681s-2(b) states, in relevant part:

> *After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute* with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall--
>
> > (A) conduct an investigation with respect to the disputed information;
> >
> > (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;
> >
> > (C) report the results of the investigation to the consumer reporting agency;
> >
> > (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
> >
> > (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or

> cannot be verified after any reinvestigation under
> paragraph (1), for purposes of reporting to a
> consumer reporting agency only, as appropriate,
> based on the results of the reinvestigation
> promptly --
> > (i) modify that item of information;
> > (ii) delete that item of information; or
> > (iii) permanently block the reporting of that
> > item of information.

15 U.S.C. § 1681s-2(b) (emphasis added).

The duties placed on information furnishers by § 1681s-2(b) do not arise until an information furnisher receives notice "pursuant to section 1681i(a)(2)" of the FCRA, which sets forth the procedures by which *consumer reporting agencies* must notify information furnishers of disputes.[20]  15 U.S.C. §§ 1681i(a)(2)(A)-(B).  Thus, an information furnisher that has received notice of a dispute from a *consumer* has no duties under § 1681s-2(b).  *Young v. Equifax Credit Info. Servs., Inc.*, 294 F.3d 631, 639 (5th Cir. 2002); *Stafford*, 262 F.Supp.2d at 784.  Rather, notice from a consumer reporting agency is "necessary to trigger the furnisher's duties under section 1681s-2(b)."  *Id.; see Johnson v. MBNA Am. Bank, N.A.*, 357 F.3d 426, 429 (4th Cir. 2004).

---

[20] "Consumer reporting agencies" are defined in the FCRA as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."  15 U.S.C. § 1681a(f).

Plaintiffs' complaint is silent with respect to any information appearing on their respective credit reports. In addition, Plaintiffs do not allege that they notified any consumer reporting agency of a dispute regarding incorrect information on their credit reports, nor do they allege that a consumer reporting agency subsequently notified Countrywide of Plaintiffs' dispute. Accordingly, Countrywide's motion to dismiss the FCRA count for failure to state a claim will be granted.

**5.    Real Estate Settlement Procedures Act**

In count IX, Plaintiffs allege that Countrywide violated RESPA by: (1) failing to post and apply payments received promptly, (2) failing to make "timely payments of escrow funds for casualty insurance premiums and property taxes," and (3) failing to "timely and adequately acknowledge, investigate and respond to consumers' qualified written request [*sic*] for information about the servicing of their loans and escrow accounts." (Paper 12, ¶ 69). In addition to arguing that RESPA does not extend to Plaintiffs' first two allegations, Countrywide states that none of the "alleged violations . . . is supported by even one factual allegation." (Paper 16, at 16).

RESPA was enacted by Congress to address three issues: (1) "Abusive and unreasonable practices within the real estate settlement process that increase settlement costs to home buyers"; (2) "The lack of understanding on the part of most home buyers

about the settlement process and its costs"; and (3) "The basic
complexities and inefficiencies in the present system for recording
of land titles on the public records." *Rawlings v. Dovenmuehle
Mortgage, Inc.*, 64 F.Supp.2d 1156, 1165 (M.D.Ala. 1999).   RESPA
states, in pertinent part:

> (e) Duty of loan servicer to respond to borrower
> inquiries
>
> (1) Notice of receipt of inquiry
>
>> (A) In general
>>
>> If any servicer of a federally related mortgage
>> loan receives a qualified written request from the
>> borrower (or an agent of the borrower) for
>> information relating to the servicing of such loan,
>> the servicer shall provide a written response
>> acknowledging receipt of the correspondence within
>> 20 days (excluding legal public holidays,
>> Saturdays, and Sundays) unless the action requested
>> is taken within such period.
>>
>> (B) Qualified written request
>>
>> For purposes of this subsection, a qualified
>> written request shall be a written correspondence,
>> other than notice on a payment coupon or other
>> payment medium supplied by the servicer, that --
>>
>>> (i) includes, or otherwise enables the
>>> servicer to identify, the name and account of
>>> the borrower; and
>>>
>>> (ii) includes a statement of the reasons for
>>> the belief of the borrower, to the extent
>>> applicable, that the account is in error or
>>> provides sufficient detail to the servicer
>>> regarding other information sought by the
>>> borrower.

12 U.S.C. § 2605(e).   The remainder of the statute, setting forth
the additional duties of mortgage loan servicers, is predicated

entirely on the servicer's receipt of a "qualified written request."  12 U.S.C. § 2605(e)(2).

Neither party has pointed to any case law applying RESPA to facts similar to this case.  Yet, from the face of the statute alone, Plaintiffs' RESPA claim is insufficient in two respects. The first two violations that Countrywide allegedly committed do not fall within the conduct prohibited by RESPA or its implementing regulations and thus are not actionable under § 2605.[21]  *See McAnaney v. Astoria Fin. Corp.*, 357 F.Supp.2d 578, 588 (E.D.N.Y. 2005) (setting forth RESPA duties).  Second, although the third alleged violation might be actionable under the statute, Plaintiffs have not alleged that they sent any correspondence to Countrywide explaining that their "account [was] in error" or seeking "other information" from Defendant.  12 U.S.C. § 2605(e)(1)(B)(ii).  The duties placed on servicers by RESPA arise only when a qualified written request has been made.  Accordingly, Plaintiffs fail to state a valid claim for relief under RESPA and Countrywide's motion to dismiss count IX will be granted.

---

[21] Subsections (a) and (b) of § 2605 do not provide Plaintiffs with a cause of action.  Subsection (a) places a duty on mortgage servicers to provide borrowers with notice of whether a loan may be "assigned, sold, or transferred."  12 U.S.C. § 2605(a).  This duty arises at the time of application, and Plaintiffs concede that they did not originally apply to Countrywide for financing.  Subsection (b) places a duty on both the transferor and transferee servicers to notify borrowers after an assignment, sale, or transfer of the loan has occurred.  12 U.S.C. § 2605(b).  Plaintiffs do not allege in the complaint that Countrywide failed to notify them of its acquisition of Plaintiffs' loan.

6.   **Maryland Consumer Debt Collection Act**

In count X, Plaintiffs allege that Countrywide violated the MCDCA, Md. Code Ann., Com. Law, § 14-201 *et seq.*, by "seeking amounts that are not lawfully due to them from the plaintiffs." (Paper 12, ¶ 72).  Countrywide argues that it is not a "debt collector" under the Maryland statute, and that no violation of that statute is properly alleged.   (Paper 16, at 16). Countrywide's argument that it is not a debt collector under the MCDCA is without merit.  The MCDCA defines "collector" differently than the federal statute.  A "collector" under the Maryland statute means "a person collecting or attempting to collect an alleged debt arising out of a consumer transaction."  Md. Code Ann., Com. Law § 14-201(b).  Countrywide falls within this statutory definition because it attempted to collect on Plaintiffs' alleged debt, which arose out of a consumer transaction.

Nevertheless, Plaintiffs' MCDCA claim is insufficient because it fails to allege any conduct on the part of Countrywide that could fall within the statute's prohibitions.  The MCDCA protects consumers from a variety of conduct on the part of collectors, including the use or threat of "force or violence," the threat of "criminal prosecution," certain communications with others regarding debts, and the use of "obscene or grossly abusive language in communicating with the debtor."  Md. Code Ann., Com. Law § 14-202.  The MCDCA's prohibitions are limited to the acts

enumerated in Md. Code Ann., Com. Law § 14-202, and, unlike § 1692f of the federal FDCPA, the Maryland statute does not expressly prohibit attempts at collecting debts not lawfully due to the collector.[22]  Accordingly, count X will be dismissed.

**7.   RICO**

In count XI, Plaintiffs allege that Countrywide violated RICO when it "knowingly devised and participated in a scheme whereby the defendant extended loans and/or obtained and serviced loans which because of the meager resources of the borrowers and/or exorbitant terms of the loans, could not be repaid." (Paper 12, ¶ 80).  In addition, Plaintiffs allege that Countrywide "committed a pattern of acts or caused a pattern of acts," including "knowingly servicing a loan with such harsh and arbitrary terms designed to force borrowers into early default."  (Paper 12, ¶ 81). Countrywide argues that Plaintiffs merely mimic the language of the RICO statute and that "they fail to support their claim with any factual allegations." (Paper 16, at 17).  Countrywide also asserts that Plaintiffs have not alleged that Countrywide was engaged in an "enterprise" as defined in the statute or that it engaged in a pattern of racketeering activity.  Plaintiffs did not respond to Countrywide's arguments in support of dismissing the RICO claim, and seek to dismiss the claim without prejudice.  (Paper 25).

---

[22] As noted, the FDCPA claim fails because Countrywide is not a "debt collector" as defined in the federal statute.

The complaint purports to allege that Countrywide engaged in racketeering activity and violated three RICO provisions: 18 U.S.C. § 1962(c), 18 U.S.C. § 1962(d), and 18 U.S.C. § 1964(c).[23]  With regard to the racketeering activity which provides the basis for their RICO claims, Plaintiffs specify that Countrywide committed mail fraud in violation of 18 U.S.C. § 1341.  Plaintiffs allege that Countrywide used the United States Postal Service "for advancing, furthering or carrying out the scheme to defraud." (Paper 12, § 76).

In relevant part, Title 18, § 1962 provides:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.
>
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

An "enterprise," as defined in the RICO statute, requires the "participation of both a RICO defendant *and* an enterprise as two separate persons."[24]  *Benard v. Hoff*, 727 F.Supp. 211, 214 (D.Md. 1989).  A RICO defendant cannot associate "with himself to carry on

---

[23] Section 1964(c) provides for civil remedies and treble damages, but does not include any independent prohibitions.

[24] An "enterprise" is defined in the statute as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

racketeering activities.   It is established therefore that defendant and enterprise cannot be one and the same." *Id.*

In order to succeed on a RICO claim, a plaintiff must show, among other things, that the defendant was involved in a pattern of racketeering activity.   A "pattern of racketeering activity" is statutorily defined and "requires at least two acts of racketeering activity," one of which occurred "within ten years (excluding any period of imprisonment) after the commission of the prior act of racketeering activity."   18 U.S.C. § 1961(5).

Racketeering activity is defined under 18 U.S.C. § 1961(1), and includes, among other things, violations of 18 U.S.C. § 1341 (mail fraud).   Like common law fraud claims, RICO claims based on mail fraud also are subject to Fed.R.Civ.P. 9(b).   *See GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 548 (4th Cir. 2001).   At a minimum, a plaintiff must identify the time, place, contents, and speaker of the alleged misrepresentation, along with what was obtained by the statement.   *See Superior Bank,* 197 F.Supp.2d at 313-14; *Adams*, 193 F.R.D. at 250.

The Fourth Circuit has used special caution when the alleged racketeering acts are mail and wire fraud:

> We are cautious about basing a RICO claim on
> predicate acts of mail and wire fraud because
> it will be the unusual fraud that does not
> enlist the mails and wires in its service at
> least twice. . . .   This caution is designed
> to preserve a distinction between ordinary or
> garden-variety fraud claims better prosecuted

under state law and cases involving a more
serious scope of activity.

*Al-Abood v. El-Shamari*, 217 F.3d 225, 238-39 (4th Cir. 2000)
(internal quotation marks and citations omitted) (concluding that
"RICO treatment" was not appropriate where the main predicate acts
were mail and wire fraud that involved one victim, even though
there were three discrete schemes spanning several years). *See
also Anderson v. Found. for Advancement, Educ. & Employment of Am.
Indians*, 155 F.3d 500, 506 (4th Cir. 1998) (holding that the use of
telephone and mail services to defraud one party with respect to
two properties does not satisfy the continuity element of RICO's
pattern requirement).

Plaintiffs have failed to allege adequate facts in support of
a RICO claim.  First, Plaintiffs have not alleged the existence of
any "enterprise."  The acts at issue all were allegedly done by
Countrywide and it cannot associate with itself to carry on
racketeering activities.  Second, Plaintiffs have made no
particular allegations, as required by Fed.R.Civ.P. 9(b),
concerning the predicate acts of mail fraud committed by
Countrywide.  The facts alleged in the complaint never refer to any
acts of fraud.  Third, even if Plaintiffs had alleged properly that
Countrywide engaged in a racketeering activity, they have not
alleged facts showing that Countrywide engaged in a *pattern* of such
activity.  Plaintiffs' complaint involves Countrywide's refusal to
accept the Plaintiffs' mortgage payoff, and Plaintiffs do not

34

allege that Countrywide made such a refusal on more than one occasion.  Accordingly, Plaintiffs fail to state a proper RICO claim in count XI and it will be dismissed.[25]

## 8. Malicious Use of Civil Process

In count XII, which Plaintiffs label as "wrongful foreclosure" in the complaint, Plaintiffs assert the Maryland tort of malicious use of civil process against Countrywide.[26]  Plaintiffs claim that Countrywide wrongfully instituted foreclosure proceedings against them in state court, and that Countrywide "knew or should have known that said foreclosure is being conducted in a negligent and reckless manner."  (Paper 12, ¶ 90).  Countrywide argues that Plaintiff has failed properly to allege each of the required elements of the tort.  (Paper 22, at 11).

The Court of Appeals of Maryland has "long recognized that suits for malicious prosecution are viewed with disfavor in law and are to be carefully guarded against."  *One Thousand Fleet Ltd.*

_____

[25] As will be discussed *infra*, count XI will be dismissed with prejudice despite Plaintiffs' attempt voluntarily to dismiss it without prejudice.

[26] Abuse of process, malicious use of process, and malicious prosecution are "essentially different and independent torts." *One Thousand Fleet Ltd. P'ship v. Guerriero*, 346 Md. 29, 36 (1997) (internal quotation marks omitted).  Malicious prosecution and malicious use of process share the same elements and are "essentially synonymous, with most of the cases referring to malicious prosecution as arising out of a criminal proceeding and malicious use of process as arising out of a civil proceeding." *Id.* at 36-37.  Abuse of process, which is not implicated here, refers to the willful use of "process after it has issued in a manner not contemplated by law." *Id.* at 38.

*P'ship v. Guerriero*, 346 Md. 29, 36 (1997) (internal quotation marks and brackets omitted).  There are five elements necessary to state a claim for malicious use of process under Maryland law: (1) a "prior civil proceeding must have been instituted by the defendant"; (2) "the proceeding must have been instituted without probable cause"; (3)  the "prior civil proceeding must have been instituted by the defendant with malice," meaning that the party was "actuated by an improper motive"; (4) "the proceedings must have terminated in favor of the plaintiff"; and (5) "the plaintiff must establish that damages were inflicted upon the plaintiff by arrest or imprisonment, by seizure of property, or other special injury which would not necessarily result in all suits prosecuted to recover for a like cause of action." *Id.* at 37.

The "special injury" required for a claim for malicious use of process requires an allegation of damages "different than those that ordinarily result from all suits for like causes of action." *One Thousand Fleet*, 345 Md. at 37.  Furthermore, "[m]ere annoyance and the expense of defending a civil action are not enough" to establish special damages. *Walker*, 237 Md. at 90.  Thus, to the extent that the damages alleged in the complaint would result from the institution of *any* foreclosure proceeding or include only damages related to the annoyance and expense of defending a civil action, the claim fails.

Plaintiffs concede that the "foreclosure sale of the property has not taken place," (Paper 12, ¶ 27), and thus there has been no forfeiture of their property.  In count XII, Plaintiffs state: "all attorney's fees and costs incurred in connection with the foreclosure cannot be charged to plaintiff and plaintiff should be reimbursed for the attorney's fees expended to defend this action." (Paper 12, ¶ 91).  Plaintiffs allege similar injury elsewhere in the complaint: "[T]he plaintiff allegedly accumulated an exorbitant amount late [*sic*] fees, legal costs, escrow advances for which the defendant is attempting to foreclose."  (Paper 12, ¶ 89).  The Court of Appeals has held that such damages do not satisfy the "special damages" element of the tort of malicious use of civil process.  *Walker*, 237 Md. at 90.

Plaintiffs concede in their opposition memorandum that the "emotional distress tied to a foreclosure . . . . does not qualify as a special damage pursuant to the requirements of an action for wrongful foreclosure."  (Paper 20, at 37).  Plaintiffs argue, however, that the commencement of foreclosure proceedings after a borrower's attempt at remitting a pay-off "creates a puzzling level of stress due to the lack of control over a previously known result."  (Paper 20, at 37).

This explanation is insufficient to survive Countrywide's motion to dismiss.  First, the distinction made in Plaintiffs' papers between typical foreclosures and the foreclosure in this

case is not found in the complaint, which is the proper focus of a motion to dismiss.   Moreover, Plaintiffs' distinction between foreclosures in general and the foreclosure here still is insufficient to show the special injury required to state a claim for malicious prosecution under Maryland law.   A "puzzling level of stress" due to a lack of control over events undoubtedly results from the institution of all foreclosure proceedings.   Because Plaintiffs have failed to allege properly a required element of the tort, count XII fails to state a claim.   *Shamberger v. Dessel*, 236 Md. 318, 321 (1964) (affirming dismissal of malicious prosecution claim when special damages were not alleged).   Accordingly, Countrywide's motion to dismiss count XII will be granted.

## 9.   Maryland Consumer Protection Act

In count XIII, Plaintiffs allege that Countrywide violated the MCPA, Md. Code Ann., Com. Law § 13-101, *et seq.*, in its "fraudulent concealment of charges and failure to reasonably apply mortgage payments to the appropriate and corresponding due payments." (Paper 12, ¶ 93).   Countrywide argues that Plaintiffs do not allege any facts to support a MCPA claim.   (Paper 16, at 20).

The unfair or deceptive trade practices prohibited by the MCPA include "misrepresentation, or *knowing concealment*, suppression, or omission of any material fact *with the intent that a consumer rely on the same* in connection with . . . the promotion or sale of any . . . consumer service."   Md. Code Ann., Com. Law § 13-301(9)(i).

38

In addition, any violation of the MCDCA constitutes a violation of the MCPA.  Md. Code Ann., Com. Law § 13-301(14)(iii).

Plaintiffs fail to state a valid claim with respect to the MCPA.  First, Plaintiffs have not alleged facts to show any knowing concealment, suppression, or omission on the part of Countrywide.  Moreover, even if Plaintiffs had alleged that Countrywide knowingly concealed information, the complaint still would be insufficient because Plaintiffs have not alleged facts sufficient to show that Countrywide intended for them to rely on any concealment that occurred.  Second, to the extent that the MCPA claim is derivative of the MCDCA violations alleged in count X, it fails because Plaintiffs have not stated a valid MCDCA claim.  Accordingly, Countrywide's motion to dismiss count XIII will be granted.[27]

## III. Class Certification

Count XIV of the complaint is labeled "Class Action Allegations," and both parties have argued the merits of class certification in papers filed with respect to the motion to dismiss.  The question of class certification is not properly before the court.  As this court has noted: "[A]nalysis of class compliance with Rule 23 is not appropriately undertaken on a motion to dismiss, but should be addressed in a motion pursuant to Rule

---

[27] Because the entire complaint will be dismissed pursuant to Fed.R.Civ.P. 12(b)(6), Countrywide's request to dismiss pursuant to Rule 12(b)(7) or its request to strike paragraphs 32 through 45 of the complaint pursuant to Rule 12(f) need not be addressed.

23(c)(1)(A)." *Popoola v. MD-Individual Practice Ass'n*, 230 F.R.D. 424, 433 (D.Md. 2005) (citing 7B Wright & Miller, Federal Practice & Procedure § 1798, at 226-27 & n.23).  Nor must the court confront the issue of class certification before disposing of Countrywide's motion to dismiss.   7B Wright & Miller, Federal Practice & Procedure § 1798, at 227 ("[D]efendant may move to dismiss a class-action complaint for failure to state a claim or for appropriate corrective action on the basis of any of the other defenses listed in Rule 12.").

## IV.  Motion for Leave to Amend the Complaint

Plaintiffs have filed a motion seeking leave to amend the First Amended Complaint pursuant to Fed.R.Civ.P. 15(a).  In their Second Amended Complaint, Plaintiffs wish to add Donald and Marisol Thompson as plaintiffs and to voluntarily dismiss their RICO claim against Countrywide without prejudice.   Countrywide objects to Plaintiffs' proposed amendment, arguing that the Thompsons should not be joined as plaintiffs and agreeing that the RICO claim should be dismissed, but that the dismissal should be with prejudice.

## A.   Adding Thompsons as Plaintiffs

In their Second Amended Complaint, Plaintiffs seek to add the Thompsons as Plaintiffs pursuant to Fed.R.Civ.P. 15(a).[28]

---

[28] Plaintiffs' request to add plaintiffs should have been made pursuant to the more specific provisions of Fed.R.Civ.P. 21 rather than pursuant to a request for leave to amend the complaint under Fed.R.Civ.P. 15(a).   7 Charles A. Wright & Arthur R. Miller,
(continued...)

Plaintiffs allege that the Thompsons were Countrywide customers who regularly made their monthly mortgage payments.  At some point, Countrywide allegedly informed that the Thompsons that they "were in arrears on their mortgage payments" before instituting foreclosure proceedings against them.  (Paper 25, ¶ 41).  In an effort to halt the foreclosure sale, which Plaintiffs allege never actually occurred, "the [Thompsons] were forced to file for protection un [*sic*] chapter 13 of the United States Bankruptcy Code." (Paper 25, ¶ 54).  Countrywide argues that leave to amend to add the Thompsons should be denied because these facts are "bald assertions unrelated to the claims of the original plaintiffs, the Thomases." (Paper 27, at 2).

Although neither party directly addresses the issue, in deciding whether to allow joinder of plaintiffs through amendment of the complaint, the court must determine whether the requirements found in the relevant joinder rule have been met.  *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 618 (4th Cir. 2001).  The permissive party joinder rule, Fed.R.Civ.P. 20(a), states in pertinent part:[29]

---

[28](...continued)
Federal Practice & Procedure § 1688, at 503-04 (3rd ed. 2005).  Rule 21 states, in pertinent part: "Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." Fed.R.Civ.P. 21.

[29] Neither party contends that the Thompsons are necessary parties pursuant to Fed.R.Civ.P. 19(a).

> All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action.

The scope of the civil action under Rule 20 "is made a matter for the discretion of the district court, and a determination on the question of joinder of parties will be reversed on appeal only upon a showing of abuse of that discretion." *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1332 (8th Cir. 1974). There are two requirements for joining plaintiffs pursuant to Rule 20: (1) a right to relief arising out of the same transaction, occurrence, or series of transactions or occurrence, and (2) a common question of law or fact. This test generally is applied by courts "on a case by case basis," in light of consideration of the rule's purpose, which is "to promote trial convenience and expedite the final determination of disputes." *Saval v. BL Ltd.*, 710 F.2d 1027, 1031 (4th Cir. 1983).

With respect to the transaction or occurrence element, "all 'logically related' events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence." *Mosley*, 497 F.2d at 1333. The events out of which Plaintiffs' complaint arises involve Countrywide's servicing of mortgages. Although Plaintiffs have not addressed the specific requirements of Rule 20, their position seems to be that Countrywide's alleged discriminatory foreclosure practices

constitute a series of similar transactions or occurrences.  Yet, "[a]bsent some causal link between a common and identifiable wrongful act on the part of the defendant and the adverse action taken with respect to each plaintiff, the first prong of Rule 20(a) is not satisfied."  *Grayson v. K-Mart Corp.*, 849 F.Supp. 785, 788 (N.D.Ga. 1994).   Plaintiffs do not point to any "particular standard, policy, or procedure of [Defendants] or claim that the alleged discrimination occurred as a result of a singular policy."[30] *Bailey v. N. Trust Co.*, 196 F.R.D. 513, 516 (N.D.Ill. 2000).  Under a reading of the rule that would permit joinder of the Thompsons, "any group of aggrieved [Countrywide mortgagors] would be entitled to join its claims under Rule 20(a).  The court declines to read the permissive joinder rules so broadly."  *Id.* at 517.

The second prong of Rule 20 requires a common question of law or fact, but "does not require that all questions of law and fact raised by the dispute be common."  *Mosley*, 497 F.2d at 1334.  Yet, as another district court in this circuit has noted:

> Common issues of law does not mean common issues of an area of the law.  For example, while two or more persons could sue a common defendant for Title VII discrimination, *based upon the same policies or conduct*, all plaintiffs could not join together in one large

---

[30] The Countrywide "policy" referred to by Plaintiffs consists of ten different mortgage servicing practices, (Paper 25, ¶ 124), only one of which (refusing to accept mortgage payoffs) corresponds with the facts alleged with respect to the Thomases.  There is no allegation that Countrywide refused to accept a mortgage payoff from the Thompsons.  Thus, this "policy" will not serve as a common occurrence for purposes of Rule 20(a).

> lawsuit, to sue all defendants for Title VII
> discrimination, just because all their claims involve
> Title VII discrimination.

*Grennell v. W. S. Life Ins. Co.*, 298 F.Supp.2d 390, 398-99 (S.D.W.Va. 2004) (emphasis added) (quoting *Graziose v. Am. Home Prods. Corp.*, 202 F.R.D. 638, 640 (D.Nev. 2001)).   In this case, Plaintiffs' claims rest upon the same general theories and areas of law –race discrimination and violations of various federal statutes- as the Thompsons' claims, but arise out of different factual circumstances.   Specifically, the allegations in the First Amended Complaint regarding the Thomases relate to Countrywide's failure to apply a one-time mortgage payoff.   On the other hand, the allegations in the proposed Second Amended Complaint regarding the Thompsons relate to Countrywide's regular failure to apply monthly payments that the Thompsons allegedly made.   (Paper 25, ¶¶ 39-44).   Thus, because the allegations "are based upon wholly separate acts of the defendant with respect to each plaintiff, the second requirement of Rule 20(a) is not met."   *Bailey*, 196 F.R.D. at 517.

Plaintiffs' proposed joinder does not satisfy the requirements of Rule 20, and Plaintiffs will not be given leave to amend the complaint in order to add the Thompsons.   Because Plaintiffs will not be permitted to join the Thompsons, the court need not address Plaintiffs' motion to amend the complaint to add counts XII, XIV, and XVI, which relate solely to the Thompsons.

**B.    Voluntary Dismissal of the RICO Count**

In their proposed Second Amended Complaint, Plaintiffs also attempt voluntarily to dismiss the RICO count of their First Amended Complaint without prejudice, pursuant to Fed.R.Civ.P. 41(a) and Fed.R.Civ.P. 15(a).[31]  Leave to amend should be denied only when "the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Edwards*, 178 F.3d at 242.  Voluntary dismissal pursuant to Rule 41(a) is not appropriate in this case because the rule applies to the dismissal of an "action," not to the partial dismissal of a multi-count complaint.[32]  *Iraheta v. United of Omaha Life Ins. Co.*, 353 F.Supp.2d 592, 595 (D.Md. 2005). Instead, the proper procedural mechanism for dismissal of part of a larger complaint is amendment of the complaint under Rule 15(a). *Id.*  However, "similar standards govern the exercise of discretion under either rule." *Id.*

---

[31] Plaintiffs' memorandum in support of its motion to amend states, in its entirety: "1. Federal Rules of Civil Procedure, Rule 15.  2. Federal Rules of Civil Procedure, Rule 41." (Paper 25).   Because Rule 41 has no application to party joinder, Plaintiffs must be relying at least in part on Rule 41 to dismiss the RICO claim.

[32] Rule 41(a) states, in pertinent part: "Except as provided in paragraph (1) of this subdivision of this rule, an *action* shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper." Fed.R.Civ.P. 41(a)(2) (emphasis added).

Rule 15(a) specifies that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a).  The Fourth Circuit has addressed the issue of a plaintiff amending the complaint in order to voluntarily dismiss a single count of the complaint.  *Weinberger v. Retail Credit Co.*, 498 F.2d 552, 555 n.4 (4th Cir. 1974).  The court explained:

> Appellant here does not seek leave to amend in order to correct an insufficiently stated claim but rather, as the district judge recognized, "to drop Count I of the original complaint without prejudice."  While it is true that allowing the amendment would have narrowed and perhaps clarified the issues before the court, it is also true that prejudice would result to appellee if the motion were allowed.  Dismissal without prejudice– the actual effect of such amendment– would have left him free to assert such claims again, putting [Defendant] to the expense of relitigation.  Though we do not impugn [Plaintiff's] motive in seeking to amend, we believe the district judge properly exercised his discretion in denying the motion because of 'undue prejudice to the opposing party.'

*Id.*

As noted, Countrywide, in its motion to dismiss the complaint, argued that Plaintiffs' RICO count was without merit and should be dismissed pursuant to Rule 12(b)(6).  Moreover, for the reasons stated, *supra*, dismissal of the RICO claim is warranted.  Plaintiffs failed to respond to Countrywide's arguments with respect to the RICO claim in their opposition memorandum.  Plaintiffs now seek to dismiss the RICO claim, without prejudice, as part of amending the complaint.  Such a dismissal would unfairly prejudice Countrywide, who already has litigated and demonstrated

the legal insufficiency of this count.  Thus, Plaintiffs will not be permitted to amend their complaint so as to dismiss their RICO claim without prejudice.

Because joinder of the Thompsons as plaintiffs does not satisfy Rule 20, and Plaintiffs' request to amend the complaint to voluntarily dismiss their RICO claim will be denied, nothing remains of Plaintiffs' proposed changes to the First Amended Complaint.  Accordingly, Plaintiffs' motion for leave to amend will be denied.

## V.    Motion to File Surreply

Countrywide has moved for leave to file a surreply regarding the portion of the Second Amended Complaint in which Plaintiffs seek to add the Thompsons as plaintiffs.  Unless otherwise ordered by the court, surreply memoranda are not permitted to be filed. Local Rule 105.2(a).  Surreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's  reply. *Khoury v. Meserve*, 268 F.Supp.2d 600, 605 (D.Md. 2003).  Because the court will deny Plaintiffs' joinder of the Thompsons as plaintiffs on other grounds, Countrywide's surreply is unnecessary.  Thus, Countrywide's motion for leave to file a surreply will be denied as moot.

47

**VI. Conclusion**

      For the foregoing reasons, Countrywide's motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) will be granted.  Plaintiffs' motion for leave to amend will be denied and Countrywide's motion for leave to file a surreply will be denied as moot.  A separate Order will follow.


                                        _____/s/_____
                                        DEBORAH K. CHASANOW
                                        United States District Judge